My name is Mark Haskell. I'm a partner with the law firm of Blank Rome, and I'll be presenting argument this morning on behalf of the BP petitioners. This case deals with BP's daily or cash market sales at the Houston Ship Channel in Texas in the fall of 2008. In this case, FERC seeks to regulate Texas intrastate sales by BP Energy Company through Texas intrastate transportation. In the orders on review, the respondent, FERC, asserted plenary jurisdiction over BP's intrastate sales in Texas, contrary to Section 1B of the Natural Gas Act, adopted a we-know-it-when-we-see-it test for market manipulation, which was defective in design and not proven in practice, presumed rather than proved manipulative intent, sanctioned a scourgement of all BP's net profits at two Texas trading locations, including one point where manipulation was not even alleged to exist, fashioned a civil penalty equal to 100 times BP's net profits by retroactively applying its own penalty guidelines, and by assuming the regulatory jurisdiction of the CFTC, established its own enforcement staff as advisors to FERC in violation of the APA and disregarded the statute of limitations applicable to FERC actions. We submit the orders on review should be reversed. FERC has no jurisdiction over the transportation of natural gas in intrastate commerce or the intrastate sale of natural gas under Section 1B of the Natural Gas Act. FERC attempts to defend itself in Congress. First, FERC contends that this court must defer to its analysis because in FERC's view, the phrase, in connection with, in Section 4A of the Natural Gas Act is ambiguous. FERC made a very similar argument before this court in Texas Pipeline Association v. FERC. It was properly rejected there. Moreover, the D.C. Circuit in Conoco v. FERC rejected an argument based on the same language, in connection with, when FERC tried to regulate another exempt category of transportation, gathering, also excluded from FERC's jurisdiction. FERC's argument fails at Chevron Step 1. The statute isn't ambiguous. Section 1B is clear. Second, even if the court were to agree with FERC that Section 4A is ambiguous, FERC's argument fails at Chevron Step 2 because it is unreasonable. FERC's claim that it is not exercising general regulatory authority over BP's intrastate sales is untenable. FERC mandated disgorgement of 100% of the net profits BP earned at two Texas trading points, roughly $207,000, and then imposed a civil penalty equal to 100 times those profits. There is nothing incidental or indirect about FERC's exercise of jurisdiction. It is total. It is complete. FERC's claim that it has direct jurisdiction over BP's transactions fares no better. On over half the 73 days in FERC's investigative period, it did not even allege the existence of one jurisdictional transaction. FERC's initial case in this proceeding did not challenge that 99% of BP's sales weren't even arguably in interstate commerce. Most significantly, in no instance in which FERC did assert the existence of jurisdiction did it show that any of the jurisdictional transactions had even one of the alleged hallmarks of manipulation identified by FERC. Putting to one side this complete failure of proof, FERC effectively contends that it had jurisdiction over all resales of natural gas imported into Texas where the upstream third-party seller made a first sale of natural gas and where the transportation occurred under Section 311 of the Natural Gas Policy Act. How did FERC get around the plain, limiting language of the jurisdictional statute? FERC's argument, Your Honor, is this. FERC's argument is that the sworn affidavit of the party who engaged in the transportation that it had employed Section 311 was incorrect because the transportation contract it signed did not expressly say that it was utilizing 311. There was no requirement that it do so. None. The applicability of 311 is automatic. It is established by the act of the pipeline, the interstate pipeline in this case, transporting on behalf of the intrastate pipeline. Moreover, FERC's argument is directly inconsistent with its own precedent in the Westar case, which expressly recognized the transportation of the transportation called Group A transactions in the record was not subject to FERC jurisdiction under the Natural Gas Act. What does FERC say about that? About its inconsistency? Our argument in this case is not merely a disagreement with FERC about the weight of evidence. You might get that impression reading the briefs of my learned colleague. Our argument is that FERC did not act in a manner that was consistent with its own decisions, consistent with the record. This is but one illustration of that fact. FERC's brief does not even cite the Westar case. FERC attempted to distinguish it by making the argument that if any party were a natural gas company, by virtue of a transaction anywhere in the United States, outside of Texas, then FERC's jurisdiction would attach to intrastate transactions. The statute does not support that reading. It is expressly barred by FERC's own regulations. So, we see a manifest inconsistency in the jurisdictional argument. Moreover, what is it that BP did in this case that constituted market manipulation? FERC's orders provide no meaningful answer. FERC concedes that the actions that BP took were not by themselves manipulative in isolation, but in concert. The combination of the eight factors led to a conclusion of market manipulation. This is the antithesis of reasoned decision making. FERC helped itself to reach this conclusion by adopting an artificial control period in this case. The control period FERC looked, the benchmark against which it tried to determine whether BP had changed its behavior, was the period from January 2nd, 2008 to September 10th, 2008. It wasn't a full year. Why does that matter? It eliminates entirely the issue of seasonality in natural gas markets. If FERC had looked at a year, what would they have found? There was no change in any element of BP's behavior. BP's fixed price sales at Houston Ship Channel, which FERC variously relied upon as potentially an indicator of manipulation, but when press said it really wasn't by itself, were no different for the two years before the investigative period and the three years afterward. There was no change in behavior. BP often traded 90 to 100% of its sales at Houston Ship Channel on a fixed price basis. Its rate of bid hitting was no different prior to the investigative period. Its early trades were no different. Three other material factors underscore the inherent irrationality of FERC's analysis of the orders on review. First, FERC created an entirely new theory of market manipulation, framing the open in a market that has no open. No other agency, no other court has adopted or embraced that theory. Moreover, no record evidence shows that BP's trades were earlier than other market participants or that their any form of harm to the market. Second, FERC measured whether BP's trades were economic. What do you have to say about this telephone conversation that occurred at the beginning of this event here? Was that clearly, to me, indicated an indication of guilt in and of itself? Your Honor, we have heard that telephone conversation. It's two minutes and 30 seconds long. You've seen the transcript many times over the last 13 and a half. Well, I'm sure you have. And because it's not, it's somewhat, to me, just reading the briefs, it's fairly incriminating. The striking thing about the tape is what is not in it. The tape talks about one thing. It talks about the economic or uneconomic use of transportation between two points, Katy and Houston Ship Channel, about 62 miles apart. Are you saying that the telephone conversation is insignificant and is irrelevant to the case that the government is making here? I'm saying that the government initiated an investigation as a result of the tape and what they found did not support the conclusion in any way, shape, or fashion that BP engaged in market manipulation. Does the tape talk about bid hitting? It does not. You've got a pretty tall hill or climb whenever you've got arbitration, an arbitrary and capricious standard of review and if it's supported by evidence, we more or less have to accept that point of view, that view of evidence. So, I mean, how do you overcome that burden that's placed on you by virtue of the standard of review? By analyzing the evidence, Your Honor. The tape may raise questions. It provides no answers. The answers, when you look at the record that FERC compiled, having taken a substantial amount of time to do so, the record does not add up. It is not supported by substantial evidence. Market manipulation remained and remains completely undefined. The elements of proof aren't even identified. The things that FERC said were manipulative, none of which are mentioned in the tape. Not once. There's no reference to earliness. There's a reference to one thing. And even on that one thing, FERC got the analysis wrong. Before you sit down, I'd like for you to explain your view of the statute of limitations. Yes. How that works in your favor. Your Honor, we raised the statute of limitations argument. This is described in the record in our motion, tab 42 and tab 45. We raised that following two events that we considered to be changes in law. The first was the Barclays 2 decision in 2017, after our request for re-hearing was filed. The second was the Kokesh decision in which the Supreme Court ruled that our argument is that those two intervening events constitute the cause. We do note, however, that the Fourth Circuit has held in the Powhatan case, applying a different statute, the Federal Power Act, that the statute of limitations is consistent with FERC's view. We believe that that decision is erroneous. It doesn't apply to the Gas Act directly. Our argument is simply this. Look at the statute as it's written. The statute has one statute of limitations, not two. The Powhatan court adopted two. It said there was a five-year statute of limitations that applied until FERC initiated a show cause proceeding followed by another five-year statute. Now, that decision was followed in the Eastern District of California in a VTOL decision in December of 2021. However, that is inconsistent with the Barclays decision in the same district that we cite. That is our contention as to statute of limitations. When you say that the Powhatan decision created two limitations periods, do you read it to say that the action accrues differently? Is that what you mean, that it accrues as to the election of the district court proceeding for one and it accrues as to the underlying unlawful conduct as to the other? In the last analysis, the initial accrual, if you accept FERC's theory, is the same. Because FERC's argument is that the initiation of a show cause proceeding stops. It basically is a proceeding. We take issue with that. Why? Because of what FERC has said when it initiates a show cause. The show cause is an inquiry. It is a proceeding, yes, but it creates no findings. There is no assessment of a civil penalty. That did not occur in this case until 2016. You could argue that the point in time is much later. We're saying that the earliest point where that could apply in this case is when the commission in this case set the case for hearing. Sorry, I think we're talking about the opposite ends of the timeline in this question. I understand you to be talking about when the action is initiated. I'm concerned about when the claim accrues. That is, when is the beginning of the limitations? I don't believe that there is a dispute in this case that much of this court found in poor labs. The beginning is when the conduct occurs, which is 2008. Mr. Haskell, thank you very much. You've got, I believe, five minutes on rebuttal. We'll see you again soon. Mr. Solomon for FERC. I take it you see things differently. We'll hear from you. May it please the court. Robert Solomon for the commission. Yes, Judge Willett, the commission does see things differently than BP, which raises both jurisdictional and factual issues. I will start with the jurisdictional issues. Congress in 2005 gave the commission broad authority to protect and promote competition. Getting down to it, it does seem to me that you far exceeded the jurisdiction that is prescribed by the specific language of the statute. No, Your Honor. The specific language of the statute is very broadly written. It is modeled after the Securities and Exchange Commission authority. Any entity directly or indirectly in connection with any manipulative or deceptive device or contrivance. The Congress instructed the commission in interpreting and administering any manipulative or deceptive device or contrivance to follow the SEC's lead in Section 78J, Subsection B of this title, which is the Securities and Exchange Act. We have decades of court precedent construing SEC cases. I do want to point out among those cases that we cite on page 50 of our brief is the 2002 SEC v. Zanford case where a unanimous Supreme Court found that the in connection with language, in that case it was in connection with the purchase or sale of any security, was ambiguous and that the agency was entitled to deference under United States v. Meade. But counsel, the SEC has nothing like the National Gas Policy Act. There is nothing in the way that the SEC regulates securities or transactions in securities that carves out intrastate activity. And FERC has to deal with the NGPA, which specifically says that BP can't be a natural gas company with respect to any intrastate sale. That's the statutory language. So I get it on the anti-manipulation provision, but you're still stuck with Section 3431A1C that says with respect to any intrastate transaction, it's not a natural gas company. So I'm not sure I understand how far you can go with the SEC analogy. Well, Your Honor, obviously the construction of Section 4A of the Natural Gas Act has to be placed in context as this court explained in Texas Pipeline Association. And the context is Section 1B of the Natural Gas Act. The context is Section 23 of the Natural Gas Act on price transparency that was added in 2005. And the context is also the Natural Gas Policy Act. One thing I do want to clarify right off the bat, the very first words out of BP counsel's mouth this morning is that the Commission is attempting to regulate intrastate sales. That is something the Commission cannot do pursuant to Section 1B of the Natural Gas Act and under those sections of the Natural Gas Policy Act. But I believe that's the reason why this case is distinct from the cases that BP cited. Isn't that exactly what you're trying to do here through the backdoor is to regulate? No, Your Honor, this is not backdoor regulation. In Texas Pipeline Association, the regulation was the disclosure of scheduling and flow information on intrastate pipelines, which is very intimate details of intrastate transactions. Here, the Commission is doing nothing to regulate the rates, terms, and conditions of intrastate service. Texas regulators remain 100% able to issue certificates for the initiation, the abandonment of service, the construction of pipelines. And again, I feel like that's a good distinction between this case and the Texas Pipeline Association case. In that case, the petitioners were the pipeline industry and Texas regulators. Here, BP stands alone. BP is not supported by the pipeline industry. It is not supported by Texas regulators, which I think is due to the fact that the Commission is not regulating intrastate activities. Indeed, BP doesn't point to any instance of regulation of intrastate activity. This applies only to manipulation? Is that what your argument is? Yes, that the action here is entirely under Section 4A, which is the anti-market manipulation. It begins and stops there. It begins and stops there. However, if the Commission had gone beyond Section 4A and had tried to regulate intrastate activity, that would have been a bridge too far, which again differentiates this case not just simply from the Texas Pipeline Association case, but also from the Conoco case in the D.C. Circuit, where the agency was regulating the rates and terms of gathering service. The agency imposed a default contract on exempt gatherers. This case is also different than the Hunter case in the D.C. Circuit because there the authority of the Commodity Futures Trading Commission was exclusive with respect to transactions in futures market. Congress knows how to provide for exclusivity of jurisdiction when it wants to. It did so in the Commodity Act. I will note that in other sections of the 2005 statute, the Congress provided in Section 3, 717B, exclusive authority in the Commission to regulate imports and exports involving liquefied natural gas terminals. And in Section 23, which is 717T-2, Congress instructed the Commission to be aware of the exclusive jurisdiction of the CFTC. But the mere fact that there are spillover or incidental or indirect effects does not mean that the Commission is encroaching upon the authority of state regulators. Counsel, can I ask you about the civil penalty calculation? Yes. Imagine with me a scheme where a natural gas company, it's a 90-day scheme. And over the course of the 90 days, it's undisputed that this is a scheme of market manipulation, hypothetically. And over the course of the 90 days, there are 89 days of economic transactions and one day of market manipulation with a big profit strike. Is the Commission's position that you could charge a 90-day scheme times a million dollars a day, 90 million dollars statutory maximum, as to the scheme I just described? For jurisdictional purposes, for the in connection with jurisdictional hook, probably only one day, one transaction that is in connection with FERC jurisdictional markets would suffice. But for purposes of the manipulative act or for developing the scient or the intent or reckless disregard, that one day might be lacking. It also might implicate the calculation of the civil penalty. That's what I'm asking about. When FERC goes to figure out what the statutory maximum civil penalty is, if the scheme lasts 90 days, but really only one day is the profit strike, I'm trying to understand the one day per violation language in the statute in the Commission's view. Well, that goes to the Commission's administration of Section 22 of the Natural Gas Act, 717T-1. Again, the Commission is trying to follow the instructions of Congress, which created a ceiling on the civil penalty of no more than one million dollars per day per violation. That was much of the Commission's exercise here, first to develop the ceiling to determine how many violations there are, and then to set the level based upon, and this is Congress's words, the nature and seriousness of the violation and the efforts to remedy the violation. With respect to the one day or the one transaction, the Commission found here, affirming the administrative law judge, that there were over 600 fixed sales transactions directly targeting the index price. So, conceivably, the ceiling could have been over 600 million dollars. You concede that some of those 600 were perfectly legitimate. So I'm trying to understand how you come up with the ceiling. Is it in a 90-day scheme, is it 90 million dollars? Or, when I hypothesized, is it one million dollars? I would say that it could be the 90 million dollars because the mere fact that a transaction targeting the price index may, in and of itself, be an open market transaction that is otherwise entirely legitimate, when combined with the intent, and when combined with the effort to suppress the price index, which is fundamental to contracting in FERC jurisdictional markets. So when a court goes to review the assessment of a civil penalty, how in the world are we supposed to figure out, so in order to show cause, FERC says we think it's 28 million dollars, then there's a radical reduction after the proceeding in front of the ALJ, both in the amount of the loss, that goes from 9 million down to less than 2, and in the amount of disgorgement that goes from 800 down to 200 thousand dollars. Yet, the civil penalty only goes from 28 million to 20. So it just seems like these numbers, there's nothing in the record that I can understand, and these are obviously lengthy orders, that explains how you get from 28 to 20, when the loss amount goes from over 9 to less than 2, and when the disgorgement goes from 800 to 200. From a reviewing court's perspective, it seems like these numbers are just kind of pulled out of thin air. It's hard to understand FERC's math. No, the numbers are not coming out of thin air. The ALJ made findings as to the number of violations, the seriousness of the conduct, and the culpability of BP to give effect to the 2005 language, nature and seriousness of the offense. The commission adopted in 2010 a penalty guidelines, which adopts a scoring system. You can look at JA 583 to 585, which is the 2016 order of the commission, that actually calculates numerically the civil penalty, employing the 2010 penalty guidelines. Ultimately, the commission found that the appropriate range should be 10 to 20 million, based upon the scoring, the factors identified in the penalty guidelines. BP views the application of the penalty guidelines as some type of retroactive imposition. That's, of course, not the case. The penalty guidelines provides further notice and further transparency as to how the agency will implement Section 22. Judge Jolly, you mentioned earlier the November 5, 2008 tape recording. We do agree that that transcript is, in fact, fairly incriminating on BP's part. It's difficult to establish scienter. Fortunately, here we have the recording. Mr. Lusky, Mr. Comfort were among the witnesses who provided live testimony before the administrative law judge, who held 13 days of hearings, listened to 15 witnesses, received over 400 exhibits. I do want to point out, in the time that I have left, that as to factual issues, yes, Judge Jolly, the standard of review is arbitrary and capricious, and when you are dealing with findings of fact, the standard of review is substantial evidence, which is more than a scintilla, but less than a preponderance. For purposes of commission proceedings, the administrative law judge and the commission needed enforcement staff to demonstrate its case with a preponderance of the evidence, but on appellate review, the standard is much lower, and that is particularly the case with respect to credibility assessments or the ALJ's weighing of competing testimony from competing experts. Fundamentally, the ALJ here found the testimony of staff witness Dr. Abrantes-Metz to be more credible than the competing analysis of BP expert Mr. Evans. Finally, I want to point out that BP, which has raised numerous issues here, has not raised the issue of the constitutional or statutory ability of the administrative law judge to hear the case in the first instance. Can we talk about something you did raise, which is the limitations period? Can you help me understand how an order to show cause constitutes, quote, an action suit or proceeding, I'm sorry, the commencement of an action suit or proceeding for the enforcement of a civil crime? Well, the conduct here was between September and November of 2008. The show cause order here issued in August of 2013, which was within five years of the conduct. I do want to point out, with respect to statute of limitations, this was not simply a matter that BP failed to raise on rehearing to the agency. This is something that BP failed to raise at any time whatsoever during the course of the proceeding. So let's just assume, though, that they're lodging in the rehearing, just assume it's preserved, assume it's before us. Help me understand how the OSC, the order to show cause, constitutes the commencement of a proceeding. This goes to the process provided by Congress on the one hand with respect to natural gas companies under the Natural Gas Act, and on the other hand with respect to electric utilities under the Federal Power Act. With respect to the Natural Gas Act, the proceeding is before a FERC ALJ, but... But that's not what the OSC does, right? The initiation of the proceeding before the ALJ didn't happen until much later, almost a year later. Right. The issue in the Barclays case presented by BP was whether the show cause order was sufficiently adversarial. As BP noted candidly, there is a 2020 decision of the Fourth Circuit, the Powhatan case, that demonstrates that it is. Can we talk about that opinion for a second? Because on page 902, Judge Wilkinson says, quote, it is undisputed that with respect to the default option, which is the one that we're talking about in our case, this is an ALJ proceeding, FERC must commence, and this is the language I'm confused by, the requisite ALJ adjudication within five years of the alleged violation. And FERC didn't do that. FERC issued an order to show cause within the five years, but did not commence, quote, this is Judge Wilkinson's words, the requisite ALJ adjudication within five years. So it strikes me that Powhatan goes the other way for you. Well, that is true. The show cause order was in 2013. The hearing order was in 2014. The difference is, and you referred to the default procedures under the Federal Power Act, in the Powhatan case, that was a case involving an electric utility as opposed to a natural gas company. And under the Federal Power Act, when we're dealing with electric utilities, the relevant provision is 16 U.S.C. 823-D, where the target of the investigation has the option to choose. So for purposes of a truly adversarial proceeding, the Barclays case suggested that it doesn't truly become adversarial until there is the election to choose de novo review in the Federal District Court. Your basic argument is that it's waived. Yes. Our basic argument is that the... if the matter is not brought up before the Commission, it shall not be considered by the Court of Appeals or the next appellate level. Exactly, Your Honor. BP argues that... How did they get around that? Yes, that there are reasonable grounds to dispense with the normal rule. Litigants can always raise a new case law which, in the mind of the litigant, changes the law. But we submit that there was no change in the law with respect to either Barclays or the Kokesh case that was submitted. Solomon, thanks very much. Appreciate your argument. Mr. Haskell, step right up. You have five minutes for rebuttal. Thank you, Your Honor. You concede that you waived the statute of limitations argument? No, Your Honor, we don't. Here's why. On what basis do you excuse yourself from having raised this matter before the Commission? Section 19B of the Natural Gas Act allows the Court to consider matters that were not presented on re-hearing if it finds a showing of good cause. Our submission, as I noted previously, is that the change in law, the Kokesh case, and the Barclays 2 decision constitute good cause. If we cannot show good cause pursuant to 19B, then Your Honor is correct. Then and only then would we have waived the argument. We submit that good cause does exist in this case. I did want to pick up on a couple of points that counsel for the Commission made. One, he would have the Court describe significance to the fact that BP stands here today alone, that there are no pipelines, there are no trade associations. The reason for that is unsurprising. The reason for that is there are no parties in an enforcement case. There is only the Commission and its enforcement staff and the respondent. There are no interveners. There is no private right of action. It is an unusual case. You're saying your friends have not abandoned you. Is that what you're saying? I'm sorry, Your Honor? You're saying that your friends and allies have not abandoned you. They have not abandoned us because there was no opportunity for them to participate. I doubt that the proposition that counsel has argued that the Commission can destroy a thing, which is in this case intrastate sales revenues, is not the power to regulate it. One of the fundamental issues that we have with the Commission is the significance of Section 1B. Congress drew jurisdictional lines. Congress can change them, but it has not. Nothing in Section 4A of the Natural Gas Act repeals or limits Section 1B. Counsel for the Commission correctly points out that in the Energy Policy Act of 2005, when Congress wanted to change jurisdiction, it did, as this court observed in Texas Pipeline Association. It changed, for example, this is one of the things he mentioned, export jurisdiction, who has responsibility for what. Congress did not do that in this case. In his argument and in the brief, there is a suggestion that the significance of becoming a natural gas company determines whether or can regulate. As I mentioned in my argument, and as counsel took issue with in his, the statute does not support that view. Moreover, FERC's regulations expressly disclaim it. What I mean by that is 18 CFR Section 284.402A, cited in our brief at pages 31 and 32, and included in our appendix, a portion of our brief that FERC did not address. FERC's blanket marketing certificates, issued by operation of law, expressly state that the jurisdictional certificates are limited and that the obligations only apply to two regulations, neither of which is the market manipulation regulation in FERC's regulations. Further, it states that there is no basis, no basis for an assertion of general jurisdiction over anything other than interstate sales for resale. We submit that on the jurisdictional issue, FERC is incorrect. As to the issue of credibility and evidence and proof, our case is really simply this. At no point in time, having taken a very long time, to proceed and analyze this case, as FERC defined what market manipulation is. That is not a question of credibility, it is a question of logic. As to the issue of civil penalties, FERC's claim, and the order states this, is that any civil penalty which is lower than the maximum theoretical penalty, whether that is, in your honor's example, 90 million dollars, or 600 million dollars, must be upheld, because it's less than the statutory maximum. That is not the standard that Congress set. There must be an analysis of when you have defined market manipulation, which FERC has never done in this case, and reviewed the proof that the sanction is appropriate for what was found. Here, that did not occur. To us, that is a failure of reasoned decision making. Thank you. Mr. Haskell, thank you very much. Appreciate both counsel this morning. It's a complex case, obviously, and consequential, so we appreciate your arguments, both written and today at the podium.